IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RODNEY KEITH EDWARDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:11CV509-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Rodney Keith Edwards brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income under the Social Security Act.[1]  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (See Docs. ## 8, 9). Upon review of the record and the arguments of the parties, the court concludes that the decision of the Commissioner is due to be reversed.

**BACKGROUND**

Plaintiff filed the present application for benefits on July 9, 2009, when he was fifty years old, alleging disability since December 1996 due to "[b]ack problems and prior gunshot

---

[1] Plaintiff also filed a Title II application for disability insurance benefits (R. 123-26), which was denied because plaintiff did not have sufficient work credits to qualify for Title II benefits. (R. 70-73; see also R. 131). Plaintiff did not appeal the Title II decision, apparently. (See R. 74 (appointing attorney to represent him as to his Title XVI claim); R. 85 (Notice of Hearing identifying Title XVI application only)). Plaintiff's Title II application is not at issue in this appeal.

wounds - having problems/headaches[.]" (R. 127-28, 138-43).[2] He indicated that his hands swell and cramp and that he cannot "walk or stand to[o] long." (R. 143). He reported that he has a tenth grade education and has never worked.[3] (R. 143, 147). He indicated that he had received treatment at Montgomery Primary Health Care between March 2009 and June 2009, and that the Montgomery County Sheriff's office and the Montgomery Police Department also have information or medical records about his back and leg problems in 2007 and 2008. (R. 145-46). He reported that he lived in an apartment with his brother and described his daily activities as "walk around and rest [a lot]" (R. 149). He asserted that he is in a lot of pain and cannot get the rest he needs, but that his condition does not affect his ability to care for his personal needs. (R. 152; see also R. 169). He is able to do cleaning and laundry, but does not cook. (R. 153). He does not drive because he has no car, and goes out every day by walking. (R. 154). He reported that he reads, watches television and goes out to church or the community center every day, and he visits with others often. (R. 155). He stated that he "can only walk so may blocks before stop[p]ing to rest[,]" and that his impairments affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, and concentrate. (R. 156). He indicated that he uses a cane and crutches, which were

---

[2] Plaintiff's previous application for benefits was denied on June 23, 2009 at the initial level. (R. 139). At the administrative hearing in the present case, plaintiff's attorney moved "to amend the onset date from December 31, 2996, to the protective filing date of July 9, 2009." (R. 32).

[3] Plaintiff's earnings record shows that plaintiff earned just over eight thousand dollars, total, in 1995 and 1996. (R. 131). These earnings were from prison work-release jobs. (R. 35). The ALJ determined that this work was not substantial gainful activity ("SGA") and, therefore, that plaintiff had no past relevant work for purposes of the disability analysis. (R. 24, 47-48).

prescribed in 2007, "from time to time[.]" (R. 157).

Because of plaintiff's allegation that his condition affects his concentration, Dr. Robert Estock, a state agency psychiatrist, reviewed plaintiff's file and completed a psychiatric review technique form. Dr. Estock noted plaintiff's activities of daily living and the lack of any history of psychiatric treatment or medication, and concluded that plaintiff has no medically determinable mental impairment. (Exhibit C3F, R. 196-209). In addition to Dr. Estock's opinion, the medical record before the ALJ included treatment notes from Montgomery Primary Health Care for plaintiff's office visits on April 8th, May 6th, and June 3rd of 2009 (Exhibit C1F), and the report of a consultative examination conducted by Dr. James O. Colley on September 21, 2009 (Exhibit C2F).

In his three office visits to Montgomery Primary Health Care, plaintiff sought treatment for continuing drainage from a small ulcer (0.2 centimeters) on his right thigh; he also complained of back pain. Laboratory tests conducted in May revealed a bacterial infection; plaintiff was given prescriptions for an antibiotic for his leg ulcer and Motrin for back pain. (Exhibit C1F, R. 179-88).

In his September 21, 2009, evaluation by Dr. Colley, plaintiff stated that he has low back pain, at a level of 2-3/10 that "radiates all over his body including both lower extremities." He reported that, in 2007, he was shot at close range in his right thigh, resulting in a fractured femur followed by open reduction internal fixation surgery; he said that he still has drainage from the exit wound but had been unable to afford to see an orthopedic surgeon. Plaintiff indicated that he had been shot twice in his left knee, with the most recent occasion

3

requiring arthroscopic surgery. Plaintiff reported bilateral knee pain of 8/10 and pounding frontal headaches. Plaintiff denied the use of alcohol but admitted to smoking half of a pack of cigarettes each day. (R. 189-90). On examination, Dr. Colley noted that "[t]he claimant appeared comfortable and in no acute distress" and concluded that "[h]is history of bilateral knee pain of 8/10 was inconsistent with his physical examination." He observed that plaintiff had no difficulty getting on or off of the examination table but had an antalgic gait, "with more of a limp on the right than the left." (R. 191). Dr. Colley observed that plaintiff "uses an unprescribed single-point cane" and that, "[b]ased on the claimant's objective physical findings he needs the single-point cane for his balance and severe degenerative joint disease of the right knee." (R. 193). Dr. Colley noted that plaintiff had "severe pain with crepitus with limited passive range of motion of the right knee," "mild pain on range of motion without crepitus on the left," 5+/5 strength of the left lower extremity and 4+/5 of the right, no peripheral edema, no atrophy, and normal muscle bulk and tone. (R. 194-95). Plaintiff's right knee was one-half of an inch larger in circumference than his left knee. (R. 194). Dr. Colley noted that "[t]he claimant admits to chills, fever, and night sweats with a possibility of osteomyelitis of the right knee." (R. 191). Dr. Colley observed that plaintiff "appeared to have only mild pain with range of motion of the dorsolumbar spine," but "trigger point tenderness at L4-L5 with moderate tenderness of the sacroiliac joints and [a]t L5-S1." (R. 194). Dr. Colley diagnosed: (1) "[s]evere degenerative joint disease of the right knee, status post gunshot wound to the distal femur requiring open reduction internal fixation and complicated by ongoing drainage from a sinus track on the medial surface, possibly osteomyelitis[;]" (2) "[t]raumatic arthritis of the left knee following gunshot wound in 2003,

status post arthroscopic surgery in 2003[;]" (3) "[d]egenerative disk disease of the lumbar spine with a history of bilateral lumbar radiculitis[;]" and (4) headaches. (R. 195).

Plaintiff's application was denied at the initial administrative level on October 2, 2009. (R. 55-69).[4] At an administrative hearing on October 14, 2010, the ALJ heard testimony from the plaintiff, a medical expert and a vocational expert. (R. 30-54). One week later, on October 21, 2010, the ALJ rendered a decision. (R. 17-29). He found that plaintiff has "severe" impairments of "bilateral degenerative joint disease of the knees (Exhibit C-2F, p. 4) status post gunshot wound to the left knee, status post gunshot wound to the right femur, status post open reduction internal fixation; mild degenerative disc disease of the Thoracic and Lumbar spine (Exhibit C-2F, p. 7);[5] and obesity (5' 9", 209 pounds per testimony)[.]" (R. 19). He concluded that plaintiff does not have an impairment or combination of

---

[4] When the single decisionmaker (SDM) prepared her physical residual functional capacity assessment, she considered records of plaintiff's medical treatment and/or evaluation in July 2007, January 2008 and July 2008, including the reports of lumbar and thoracic spine x-rays performed in July 2008. (R. 63, Physical RFC dated October 2, 2009). The "explanation of determination" issued on the same day, however, omitted these medical records from the list of "evidence ... used in evaluating [plaintiff's] claim." (R. 64). The explanation listed only the September 21, 2009 consultative examination report and the records from Montgomery Primary Health Care included in the administrative transcript as Exhibits C1F and C2F. (R. 64-69; see also R. 179-95). The 2007 and 2008 records considered and described briefly by the SDM were not before the ALJ and are not included in the administrative transcript before the court. (See R. 28-29 and Exhibits C1F through C3F). The only records DDS provided to Dr. Colley, the consultative examiner, were the treatment notes from Montgomery Primary Health Care ("the HSI Adult Medicine progress notes"). (R. 189).

[5] At the cited page of the record (R. 195), Dr. Colley diagnosed "[d]egenerative disk disease of the lumbar spine with a history of bilateral lumbar radiculitis." The diagnosis of degenerative disc disease of the thoracic spine appears in the SDM's description of July 4, 2008 x-rays of plaintiff's lumbar and thoracic spine, evidence not included in the record (see R. 63); the medical expert testified to a diagnosis of "degenerative disk disease or the lumbar spine and thoracic spine and osteomyelitis, probable osteomyelitis of the femur" (R. 45). Dr. Johns added that the osteomyelitis is a "presumed diagnosis as far as whether . . . he has osteomyelitis with a draining sinus. That's not elucidated in the records here." (R. 45).

impairments that meets or medically equals the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to:

> perform "nearly the full range of light work as defined in 20 CFR 416.967(b) in that he can frequently lift or carry up to 10 pounds and can occasionally lift or carry up to 20 pounds. He can sit for 6 hours total in an 8-hour day, and at one time for 1 hour without interruption. He can stand/walk in combination for 4-6 hours total in an 8-hour day, and at one time for 30 minutes without interruption. These limitations take into account the claimant's use of a cane, his obesity, and his knees. He has no demonstrated issues of limitation in the use of the hands for simple grasping or fine manipulation. He is limited to occasional use of his feet for repetitive movements such as the pushing and pulling of foot controls. The claimant is precluded from climbing ladders, ropes or scaffolds and from participating in activities involving unprotected heights or hazardous or moving machinery.He is limited to occasional bending, stooping, crawling, climbing, and use of stairs and crouching. He is precluded from squatting and balancing. In addition, the claimant suffers from mild to moderate pain, which occasionally interferes with his concentration, persistence and pace. He is limited to simple, unskilled, repetitive, routine work requiring little judgment, with only routine changes and no multiple or rapid changes.

(R. 20). He determined that plaintiff has no past relevant work, but that there are jobs that exist in significant numbers in the national economy that the plaintiff can perform. (R. 24-26). The ALJ found that plaintiff has not been under a disability as defined in the Social Security Act from his alleged onset date through the date of the decision. (R. 28).

Plaintiff appealed the ALJ's decision to the Appeals Council, providing evidence of plaintiff's treatment at the Jackson Hospital emergency room on August 17, 2010 (R. 217-21), and his follow-up appointment with Dr. Randall Cook at Jackson Hospital's ambulatory care clinic on September 8, 2010 (R. 211-16). (Exhibit C4F).[6] At the emergency room,

---

[6] At the hearing, plaintiff's previous attorney questioned him about this treatment. (R. 42-43). However, the attorney did not offer the medical records into evidence or ask the ALJ to hold the record open

6

plaintiff complained of low back pain and infection of his right knee. (R. 218).[7] As to his back pain, plaintiff denied radicular numbness or tingling and, also, denied any history of radiating pain. (R. 219). He reported generalized pain and a flare-up of pain in the right knee and back after the "MPD jumped on [him] while he was sitting at the gas station drinking with some other people[.]" (R. 219). No obvious signs of injury were noted. (R. 219). Plaintiff was observed to ambulate with "relative ease with slight limp" and to be comfortable and in no apparent distress. On musculoskeletal examination, the physician noted "right and left paravertebral spasm" and "2 wounds in the distant right thigh that appear to have chronic granulomatous scarring and fibrosis" and were minimally tender to palpation, but with "no frank pus" or "fluctuance." (R. 220). The ER doctor rendered a primary diagnosis of chronic back pain; he prescribed Ibuprofen and an antibiotic and advised plaintiff to see Dr. Randall Cook for follow-up and, also, to arrange follow-up with Lister Hill Clinic.  (R. 220-21).

When plaintiff saw Dr. Cook on September 8, 2010, he complained of right knee and back pain. Dr. Cook noted, "He has a small open wound on the medial aspect of the right

---

to receive them, and the ALJ did not suggest that the attorney provide the records.

[7] Plaintiff reported during the August 2010 ER visit that he "lives with family." (R. 218). His testimony at the hearing about his living arrangements was vague (see R. 34-35)(in response to the question "Who do you live with these days?" stating, "Well, right now, you know, it's just about – just like homely because of my brother, but you know it's schizophrenia... . And he think I'm trying to shoot him and poison him and stuff so you know he give me a problem with that and so I just move on and try to stick around, you know, for right now; but I do have a brother who go get my mail and stuff.  You know, I have another brother pick my mail up and bring it to me, sir."). Plaintiff's testimony appears to indicate (as the ALJ and Commissioner understood it) that he was then homeless due to difficulties with his brother. (R. 21; Commissioner's brief, Doc. # 12 at p. 4).

thigh, which he says festers up and drains from time to time.  He denies any chills or fever." (R. 212).  Dr. Cook further indicated that plaintiff "denies alcohol consumption, although he has a history of frequent episodes of encounters with law enforcement because of drunkenness." (Id.).  Dr. Cook observed no edema and full range of motion in all extremities. (R. 213).  He noted the "very small circular wound [on plaintiff's thigh] with protuberant granulation tissue at its center. The wound measures approximately 0.6 cm in greatest dimension. With some probing, a Q-tip drops in perpendicular to the skin for a distance of 8 cm to the point where it impacts the femoral shaft. There is no drainage and no odor in association with wound, and the periwound skin is in completely normal condition."  (Id.). Dr. Cook diagnosed: (1) "Chronic draining wound medial aspect, right thigh[;]" (2) "possible chronic osteomyelitis in association with prior fracture of the right femur secondary to gunshot wound[;]" (3) "History of hypertension untreated[;]" and (4) "History of alcoholism and alcohol abuse."  (R. 213).  Dr. Cook concluded:

> The patient's wound does not need any specific treatment at this time.  I have advised him to go ahead and take another course of trimetheprim-sulfamethoxazole to possibly suppress any infection which might be present. I have also counseled him at length with respect to the need for obtaining specific intervention for what appears to be an ongoing deep infection of the right thigh and possibly chronic osteomyelitis or infection of a previous prosthetic implant in the right thigh. He indicates that he has begun the process of making application for disability so that he can get on Medicare. Again, I have emphasized to him the importance of following through with this application so that he can obtain appropriate treatment for his injury.

(Id.).  Plaintiff was discharged with instructions to return to the clinic "if needed upon getting insurance for ortho consult[.]" (R. 216).

On May 6, 2011, the Appeals Council denied plaintiff's request for review (R. 1-5) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff contends that the ALJ's residual functional capacity finding is not supported by substantial evidence. He points out that, had the ALJ found him to be limited to sedentary work, he would be disabled pursuant to the "grids." He argues that, in view of "both Dr. Colley and Dr. Johns noting severe pain with difficulty with ambulation, more was needed

9

for the ALJ to assess 'nearly light work'" and, accordingly, that the ALJ should have further developed the record by obtaining a residual functional capacity assessment from a medical source. (Doc. # 11, pp. 4-5, 9-12). The Commissioner responds that the evidence of record "substantially supports the ALJ's residual functional capacity finding." (Doc. # 12, p. 9). The Commissioner points to those portions of Dr. Colley's report that indicate a lesser degree of pain, plaintiff's daily activities report indicating that he could clean and do laundry for an hour at a time and that he walked every day, plaintiff's hearing testimony that he washes laundry at a cousin's house and had walked for three blocks to the bus station on the day of the hearing without his cane, and Dr. Cook's observation that plaintiff had full range of motion in his extremities and only a small wound with protuberant granulation on his right thigh. (Id., pp. 9-10). The Commissioner asserts that the regulatory provision cited by plaintiff (Doc. # 11, p. 12) – requiring that the Commissioner contact a consultative examiner for more information if the report is "inadequate or incomplete" – is not implicated because Dr. Colley's examination notes provided "ample substantial evidence" to support the ALJ's RFC determination.[8]

The record as a whole, including the hearing transcript, reveals that the ALJ's decision is not supported by substantial evidence, and even if the ALJ's RFC determination were supported by substantial evidence, his step five finding is not. This is true for several reasons.

---

[8] The Commissioner does not respond directly to plaintiff's contention that the ALJ should have further developed the record by obtaining "a properly assessed RFC from a treating or examining source." (Doc. # 11, p. 12; see Doc. # 12). However, that issue is intertwined with the issue of whether the record includes substantial evidentiary support for the ALJ's findings.

First, the ALJ's statement, in step three of the sequential analysis, that "Dr. Johns testified that the claimant does not meet or equal a listing" is not an accurate representation of Dr. Johns' testimony. As the Commissioner acknowledges, Dr. Johns "said that he *did not have enough information* to find whether Plaintiff's impairments met or equaled a Listing." (Doc. # 12, p. 5) (emphasis added).[9]  While the claimant bears the burden of proving that he is disabled and of producing evidence in support of his claim, the ALJ has a basic duty to develop the record.  See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).  There were not many medical records before the ALJ – just a few skeletal treatment notes from the spring of 2009 and a consultative examination in September 2009. However, the administrative transcript reveals that DDS had other medical evidence that was available and considered by the SDM in evaluating the present claim but, inexplicably, this was not provided to the consultative examiner, the medical expert or the ALJ.  The SDM's notes refer to treatment notes in 2007 and 2008 pertaining to the impairments the claimant now asserts as a basis for disability and, also, to the existence of x-rays of the femur fracture site performed several months after plaintiff's surgery and x-rays of plaintiff's lumbar and thoracic spine performed in July 2008.  (R. 63).  While this evidence may not have resulted in different testimony from Dr. Johns and/or different conclusions from Dr. Colley had these physicians considered it, the court cannot assume that this is so.

Second, the ALJ's questioning of the vocational expert reveals that the ALJ could not assess plaintiff's ability to stand and/or walk sufficiently to support his step five conclusion

---

[9] See R. 45-46.

that plaintiff could perform other work. A claimant's residual functional capacity is the most the claimant can still do despite his limitations (see 20 C.F.R. § 416.945(a)), "on a **regular and continuing** basis." SSR 96-8p (emphasis in original). "A 'regular and continuing basis' means 8 hours a day for 5 days a week, or an equivalent work schedule." (Id.). The testimony was as follows:

> Q. . . . Let's ask you to assume a person the Claimant's age and education and who can sit. I'll have to dictate it to you. Who can sit about six hours without interruption an hour, who can *stand and walk for a combination of these activities four to six hours, without interruption 30 minutes.* Who can do light exertion work. This is tak[ing] into account his issues with his knees and his back and also this need to use a cane, even though it's not prescribed. So we're going to say that he can frequently lift and carry 10 pounds, occasionally up to 20. No issues demonstrated with his ability to grasp or manipulate his hands. However, because of the problems with his knees I'm going to limit to only occasional use of his feet for operation of foot controls. Postural limitations we would indicate could occasional bend, could occasional stoop and crawl and climb and use stairs and crouch. However, he could not bend to the degree of kneeling and I guess squatting would be a similar term. And I also I think I would restrict him from balancing activities. Along with the balancing activities I would indicate that he could not use ladders, ropes, or scaffolds. He could not be around unprotected heights and he could not be around moving or hazardous machinery or drive commercial motorized vehicles. His pain is assessed as mid to moderate, which occasionally interferes with his concentration, persistence and pace. Due to his, I guess lack of education, let's put it that way, let's restrict him to simple, unskilled, repetitive and routine jobs that require little independent judgment with only routine changes, no multiple or rapid changes. And he has no past relevant work. Are there any jobs that such a person can do?
>
> A. I have a question back on hypothetical one.[10] You said stand and walk 30 minutes.
>
> Q. Without interruption.

---

[10] The question set forth above was the first hypothetical. (R. 47-49).

> A. Without interruption. Okay.
>
> Q. Yeah, four to six hours, but a combination of those activities.
>
> A. Four to six hours. Okay. *The reason I'm asking that point right there would be a difference between heavy and light and sedentary because the low end of that's 4, the top end of that is 6.*
>
> Q. Right.
>
> A. So do you – well, what you're looking for is we can do a combination, like maybe sedentary and light jobs or – because that range could – one end is sedentary, one end is light.
>
> Q. *Well, I guess I'm trying to account for whether he's having a good day or a bad day. And it's a combination of activities. You know, some days he might feel like standing, but not feel like walking. So I was trying to estimate what I thought would be his maximum of abilities. Well, it's hard to say. I'm just going to have to say that I think that his maximum is somewhere between four to [s]ix hours in a day, without interruption, 30 minutes. That's the best estimate I could give you.*
>
> A. Well, okay, well, that's a big – okay. On the low end, let's just – I'll do it like this, on the low end of that hypothetical, four hours a day, that would put him at the sedentary range, sedentary jobs because he'd be sitting – he could sit six hours without interruption. And on the high end of that if you'd like jobs, so could I give you like some light and some sedentary he could do?
>
> Q. Yeah, give me light jobs that you think he can do and then give me some sedentary.

(R. 48-50)(emphasis added). The vocational expert testified about three light jobs: cashier, garment folder, and storage facility rental clerk. (R. 50-51). He concluded his testimony regarding the light jobs by testifying, "Those are the light jobs *on that end*." (R. 51)(emphasis added). He testified to "sedentary jobs based on that hypothetical" of food and beverage order clerk and production inspector. (R. 51).

In his decision, the ALJ summarized the vocational expert's testimony as stating that, given the claimant's age, education, work experience and residual functional capacity, the claimant could perform the requirements of representative occupations including all five of the above-identified jobs. (R. 25). It is clear, however, that the vocational expert bifurcated his response into those jobs the claimant could do if his walking/standing were limited to the "low end" of the range presented by the ALJ's question – i.e., sedentary jobs – and representative jobs the claimant could do if his walking/standing were at the other "end" of the range indicated by the ALJ – *i.e.*, light jobs. Thus, the VE's testimony does not provide substantial evidentiary support for the ALJ's conclusion that plaintiff, with the RFC determined by the ALJ, can perform the requirements of all of the representative jobs listed by the ALJ.

The ALJ's step five finding cannot be salvaged through a harmless error analysis by analyzing the issue as if the ALJ had found plaintiff's standing/walking limitation to be on the "low end" of the range he presented to the VE. While the ALJ's hypothetical to the VE and his RFC finding both included a limitation to sitting for about six hours, but for just one hour without interruption (See R. 20, 48), the VE – in attempting to clarify the hypothetical – stated his understanding that the claimant "could sit six hours without interruption." (R. 50)("[O]n the low end of that hypothetical, four hours a day, that would put him at the sedentary range, sedentary jobs because he'd be sitting – *he could sit six hours without interruption*.")(emphasis added). The ALJ did not correct the VE's misunderstanding of the length of time the hypothetical claimant could sit without interruption. (Id.). Thus, the

14

sedentary jobs identified by the VE for the stand/walk limitation on the "low end of the hypothetical," according to his testimony, assume the ability to sit for six hours without interruption. The ALJ found plaintiff to be more limited than this, in that he can sit only one hour without interruption. Additionally, the two jobs identified by the VE as consistent with a sit/stand option – cashier and storage facility rental clerk (R. 52) – were light jobs identified by the VE "on that end." (R. 50-51). The ALJ indicated that the duration of plaintiff's maximum standing and/or walking abilities was "hard to say" (R. 50) and he did not find it to be on the high end of the range (R. 20; see also R. 50 ("I think that his maximum is somewhere between four to [s]ix hours in a day, without interruption, 30 minutes. That's the best estimate I could give you."). Thus, upon consideration of the record, the court concludes that the ALJ's RFC determination and his step five conclusion are not supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, and upon review of the record as a whole, the court concludes that the Commissioner's decision is due to be reversed, and this action remanded to the Commissioner for further proceedings. A separate judgment will be entered.

DONE, this 18th day of June, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE